UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TREMAIN JONES,

                Petitioner,                Case Number 2:08-CV-14126
                                                        Honorable Lawrence P. Zatkoff

v.

JOHN PRELESNIK,

                Respondent,
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS AND DENYING A CERTIFICATE OF APPEALABILITY

This matter is before the Court on Petitioner Tremain Jones's petition for a writ of habeas corpus, filed under 28 U.S.C. § 2254. Petitioner is currently incarcerated at the Robert A. Handlon Correctional Facility in Ionia, Michigan.[1] His petition challenges his convictions for one count of carjacking, MICH. COMP. LAWS 750.529a, four counts of armed robbery, MICH. COMP. LAWS 750.529, two counts of felony-firearm, MICH. COMP. LAWS 750.227b, one count of assault with intent to rob while armed, MICH. COMP. LAWS 750.89, one count of first-degree home invasion, MICH. COMP. LAWS 750.110a(2), one count of kidnaping, MICH. COMP. LAWS 750.349, one count of extortion, MICH. COMP. LAWS 750.213, one count of unarmed robbery, MICH. COMP. LAWS 750.530, and two counts of impersonating a police officer. MICH. COMP. LAWS 750.215(3). For the reasons that follow, the Court denies the petition.

_____

[1] When petitioner filed his petition for a writ of habeas corpus, he was incarcerated at the Carson City Correctional Facility, but he has since been transferred to the Robert A. Handlon Correctional Facility. The only proper respondent in a habeas case is the warden of the facility where the petitioner is incarcerated. *See Edwards Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *See also* Rule 2(a), 28 U.S.C. § 2254. Therefore, the Court substitutes Warden John Prelesnik in the caption.

## I. Facts and Procedural History

The Wayne County Prosecutor filed five separate complaints against Petitioner alleging that he committed a number of crimes while he impersonated a police officer between July and August of 2005. After protracted pretrial proceedings, Petitioner pled no contest to the charges in three of his cases in exchange for dismissal of charges in two other cases, and a sentence agreement calling for a fifteen year controlling minimum term of imprisonment plus a mandatory two year consecutive term for firearm offenses.

With respect to the three cases to which Petitioner pled, the facts were summarized during the plea hearing. In the first case, the victims Andre Holloway and Terry Kilgore were driving in a car in the City of Detroit when Petitioner and another man, driving a black Impala, drove up next to them. Petitioner identified himself by badge and by flashing lights, and directed Mr. Holloway to the side of the road. Once the car was stopped, Mr. Kilgore was removed from the car, placed in handcuffs, and placed in the back of the Impala. His property was taken at gun point. Mr. Holloway was then ordered by Petitioner to drive to a location off of the expressway. When he arrived, Mr. Holloway was removed from the car, placed in handcuffs at gun point and his property was taken.

In the second case, Petitioner and another man forced their way into a house in Detroit, and acted like they were police officers performing a drug raid. One of the occupants of the house, Dallas Thomas, was pushed to the floor, his hands were bound, and he was robbed of his property. Two other occupants, Carolee Kirkland and Maurice Thompson, were removed from their bedroom, and their hands were bound with zip ties behind their backs. Both Petitioner and his partner were armed with handguns during this incident and demanded drugs and money. They ransacked the

house and removed items of personal property.

In the third case, Petitioner wore a badge around his neck and pulled up in a black Impala at a residential address in Detroit. He approached Byron Bryant and acted like he was arresting Bryant for a narcotics violation. Bryant was handcuffed and placed in the back of the Impala. Petitioner then told Bryant's mother – who was on the scene – that he would contact her later. He later attempted to extort one thousand dollars from her in order to drop what he said were going to be charges against her son for drug dealing. Petitioner took a couple hundred dollars and other personal property from Bryant.

Prior to entering his plea, Petitioner expressed his dissatisfaction at multiple court appearances with the quality of his various appointed attorneys' performance. Petitioner also protested his innocense on a number of occassions, claiming that his twin brother was responsible for committing the offenses.

The matter came to a head on April 7, 2006, during what was scheduled to be a pretrial conference. At this proceeding, the trial court denied Petitioner's request to remove his eighth attorney and informed him that the case would proceed to trial on April 24, 2006. The court then turned to the prosecutor's motion in limine and ruled that the charged conduct in each of the five cases would be admissible in all of the cases as other-act evidence. Defense counsel opposed the motion on the grounds that there was an issue as to Petitioner's identity, and counsel referred to Petitioner's twin brother as being the possible perpetrator of the crimes. The prosecutor responded that Petitioner had confessed to three of the five cases and that the victims identified Petitioner in line-ups in all five cases. The prosecutor stated that Petitioner did have a twin brother, but that "they look nothing alike. Nobody could confuse them in a line up." Tr. 2/24/2006, at 8.

house and removed items of personal property.

In the third case, Petitioner wore a badge around his neck and pulled up in a black Impala at a residential address in Detroit. He approached Byron Bryant and acted like he was arresting Bryant for a narcotics violation. Bryant was handcuffed and placed in the back of the Impala. Petitioner then told Bryant's mother – who was on the scene – that he would contact her later. He later attempted to extort one thousand dollars from her in order to drop what he said were going to be charges against her son for drug dealing. Petitioner took a couple hundred dollars and other personal property from Bryant.

Prior to entering his plea, Petitioner expressed his dissatisfaction at multiple court appearances with the quality of his various appointed attorneys' performance. Petitioner also protested his innocense on a number of occassions, claiming that his twin brother was responsible for committing the offenses.

The matter came to a head on April 7, 2006, during what was scheduled to be a pretrial conference. At this proceeding, the trial court denied Petitioner's request to remove his eighth attorney and informed him that the case would proceed to trial on April 24, 2006. The court then turned to the prosecutor's motion in limine and ruled that the charged conduct in each of the five cases would be admissible in all of the cases as other-act evidence. Defense counsel opposed the motion on the grounds that there was an issue as to Petitioner's identity, and counsel referred to Petitioner's twin brother as being the possible perpetrator of the crimes. The prosecutor responded that Petitioner had confessed to three of the five cases and that the victims identified Petitioner in line-ups in all five cases. The prosecutor stated that Petitioner did have a twin brother, but that "they look nothing alike. Nobody could confuse them in a line up." Tr. 2/24/2006, at 8.

Petitioner continued to argue that his attorney should be replaced, accused the prosecutor of preventing him from receiving mail and phone calls in jail, and complained that he had not received a complete discovery packet. The trial court stated that Petitioner "is employing every dilatory tactic he can and is being an obstructionist to his own detriment maybe in some cases. In terms of this case, it's going to trial. I don't think Mr. Jones wants the cases to go to trial and they're going to go." *Id.* at 13.

The court then asked whether there had been a plea offer. The prosecutor responded that the offer was a sentence agreement for a minimum term of sixteen years plus two years for the firearm offense, and dismissal of two of the five cases. The court the asked the prosecutor what Petitioner's exposure as charged was, and the prosecutor stated:

> Judge, on the most serious case where he committed a home invasion and robbed several people, bound them up, his exposure is at least eighteen and three-quarters years on the minimum of the guidelines, I believe plus two for the felony firearm. He's habitual third. That makes his exposure go up to fifty - well, strike that. I have his minimum exposure being twenty-two and a half years and his maximum exposure being fifty-six and a quarter years.

*Id.* at 14.

The prosecutor stated that if Petitioner was convicted after a trial, he would be asking for a sentence of fifty-eight years, but his offer asked for a sentence of eighteen years. The Court then stated:

> We'll have to pick some trial dates in the event there is not a resolution here. But there's such a disparity in sentencing, he's still a relatively young man. I'm hoping that the sides can get together and talk and see if there's a resolution short of all these trials. But if we need to try them, we're going to try them. I've got them scheduled, we'll add in two more.
>
> But if he's convicted as charged, he's basically potentially looking at the rest of his life incarcerated. He has a two-year-old boy to think of. So let me know what you want to do, if there are any motions you want to bring to my attention.

*Id.* at 18.

After a short recess, the prosecutor reduced the sentence agreement to fifteen years plus two. The prosecutor noted that Petitioner's co-defendant was convicted after a trial and received sentences of fourteen to thirty years plus two. The court noted that the cases against Petitioner would likely be reassigned to another judge for trial and "he's not going to be bound by anything that I've said in this court." *Id.* at 19.

The following colloquy then occurred:

The Court: It was sixteen plus two. You've gone to fifteen and that's your final offer.

Defense Counsel: That's fifteen plus two?

Prosecutor: Correct.

The Court: If he's convicted, he's at 58 or something?

Prosecutor: 56 plus two if he's convicted of everything.

The Court: Do we have a decision today [defense counsel]?

Defense Counsel: We don't have a decision today, your Honor.

*Id.* at 21-22.

Petitioner then stated "I just want to get it over withn. . . Let's do that. So I got seventeen years altogether?" *Id.* After a short adjournment in which the plea agreement was reduced to writing, the court received Petitioner's plea. The court read the written agreement into the record. The agreement provided for Petitioner to plead guilty to the charges filed in three of the cases. In exchange, the prosecutor dismissed the charges in the other cases. The deal included a sentencing agreement imposing a minimum term of fifteen years for the capital charges, plus a consecutive two year term for the firearm convictions.

Petitioner acknowledged that this was his understanding of the agreement. Petitioner denied that there were any other agreements or understandings other than what was placed on the record. Petitioner stated that he was thirty-four years old and had seven years of college. He stated he understood the proceedings. The Court informed Petitioner of the trial rights he was waiving by entering into his plea, and Petitioner agreed to give up those rights. Petitioner denied that any promises or threats were made to him in order to get him to plead. A factual basis for the pleas was made by use of investigator's reports. The trial court accepted the pleas and found that they were made voluntarily and knowingly.

Subsequently at the sentencing hearing, Petitioner indicated that he wished to withdraw his plea. Petitioner stated that when he met with another attorney in Macomb County with respect to charges brought there, he was informed that the sentencing guidelines in his Wayne County cases had been scored too high. He asserted that he would not have pled guilty had he known that the sentencing agreement did not significantly reduce his sentence. "I'm only seeking it because they forced me to do too much stuff here and I feel like if you all going to give me 25 years, I might as well go to trial." ST, at 10. The trial court denied the motion and sentenced Petitioner under the terms of the sentencing agreement.

Following sentencing, Petitioner was appointed appellate counsel, who filed an application for leave to appeal in the Michigan Court of Appeals that raised two claims:

> I. The trial court abused its discretion and violated Mr. Jones' State and Federal constitutional rights to due process in denying his motion to withdraw his plea prior to sentencing, where his plea agreement was not knowing and intelligent and therefore not voluntary.
>
> II. The trial court abused its discretion and violated Mr. Jones' State and Federal constitutional rights to due process in denying his motion to withdraw his plea prior to sentencing, where his plea agreement was coerced.

The Michigan Court of Appeals denied the delayed application for leave to appeal "for lack of merit in the grounds presented." *People v. Jones*, No. 277677(Mich. Ct. App. May 21, 2007). Petitioner then filed an application for leave to appeal in the Michigan Supreme Court raising the same two claims. The Michigan Supreme Court denied leave to appeal. *People v. Jones*, No. 134428 (Mich. Sup. Ct. September 24, 2007).

Petitioner then filed the instant petition and asserts two claims:

I. Petitioner is being held in violation of his State and Federal constitutional rights to due process where he motioned to withdraw his plea prior to sentencing where his plea agreement was unknowing and unintelligent and therefore not voluntary.

II. Petitioner is being held in violation of his State and Federal constitutional rights to due process where he motioned to withdraw his plea prior to sentencing where his plea agreement was coerced.

### III. Standard of Review

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pursuant to the AEDPA, Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 130 S.Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)((*quoting Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S.Ct. 770, No. 2011 WL 148587, * 11 (U.S. 2011)(*citing Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (*citing Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. 770.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal

courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (*citing Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

## IV. Analysis

### A. Overcharging by Prosecutor

Petitioner's first habeas claim challenges the validity of his pleas on the ground that the prosecutor falsely charged him with being a habitual offender and exaggerated the value of the plea bargain. The claim is based on two factual allegations. First, Petitioner asserts that the prosecutor's statement that Petitioner faced a minimum term of over fifty-six years under the guidelines if he was convicted after a trial was based on an exaggerated calculation of the sentencing guidelines. Second, Petitioner asserts that his twin brother stole his identity and committed the prior felonies supporting the habitual offender charge. Petitioner submits documentation purporting to show that he was serving overseas with the Marines from 1990 to 2002, when these prior offenses were committed. Petitioner alleges that the prosecutor knew of this information but nevertheless charged him as a habitual offender. Respondent asserts that the claims are without merit. The Court finds that the

state court's denial of this claim on the merits was not so lacking in justification that there was "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" as required for habeas relief under the *Harrington* standard.

A valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Moreover, a state defendant has no constitutionally guaranteed right to withdraw a guilty plea. *See Carwile v. Smith*, 874 F.2d 382 (6th Cir. 1989). The only constitutional challenge that a habeas court may entertain with regard to a plea of guilty is that the plea was not entered in a knowing and voluntary fashion under the standards first set forth by the Supreme Court in *Boykin v. Alabama*, 395 U.S. 238 (1969). *See also Bousley v. United States*, 523 U.S. 614, 618 (1998).

The propriety of a guilty plea is assessed by reviewing the totality of the circumstances surrounding the plea. *Brady v. United States*, 397 U.S. 742, 748-49 (1970). A criminal defendant enters a guilty plea knowingly when he understands the nature of the charge and the "direct consequences" of his guilty plea. *See Brady*, 397 U.S. at 748. In general, a defendant is aware of the direct consequences of the plea if he or she is aware of the maximum and minimum (if any) sentence that may be imposed. *See King v. Dutton*, 17 F.3d 151, 153-54 (6th Cir. 1994); *Hart v. Marion Corr. Inst.*, 927 F.2d 256, 259 (6th Cir. 1991).

When a state defendant brings a federal habeas petition challenging the voluntariness of his plea, the state generally satisfies its burden of showing a voluntary and intelligent plea by producing a transcript of the state-court proceeding. *Stumpf v. Mitchell*, 367 F.3d 594, 600 (6th Cir. 2004). Where the transcript is adequate to show that the plea was voluntary and intelligent, a presumption of correctness attaches to the state-court findings of fact and to the judgment itself. *Id.* A

satisfactory state-court transcript, containing findings after a proper plea colloquy, places upon petitioner a "heavy burden" to overturn the state findings. *Id.*; *see also Parke v. Raley*, 506 U.S. 20, 29-30 (1992).

Petitioner's specific claims allege that misrepresentations by the prosecutor resulted in an illusory plea bargain because Petitioner did not have an accurate understanding of the value of the agreement. Illusory representations made by the prosecutor to induce a defendant to waive his right to trial and enter a guilty plea can be found to constitute coercion justifying the withdrawal of a guilty plea. *See United States v. Randolph*, 230 F.3d 243, 250-51 (6th Cir. 2000); *Spearman v. United States*, 860 F. Supp. 1234, 1249 (E.D. Mich. 1994). However, a plea bargain is not illusory even where a charge dropped in exchange for the plea bargain is later discovered to have lacked an adequate foundation or sufficient evidence. *See United States v. Quisenberry*, 198 F. 3d 248 (Table); No. 98-3618, 98-3994, 98-4156, 1999 U.S. App. LEXIS 30168, 1999 WL 1073659, at *6 (6th Cir. November 17, 1999)(*citing People v. Marsh*, 36 Cal. 3d 134, 202 Cal. Rptr. 92, 679 P. 2d 1033 (Cal.1984)). *See also U.S. v. Morgan*, 958 F. 2d 847, 849 (8th Cir. 1992)(the fact that two of the seven counts against defendant were invalidated because defendant's conduct was determined not to violate the relevant statutes did not entitle defendant to withdraw his entire guilty plea).

Petitioner first asserts that the prosecutor exaggerated his sentencing exposure by inflating the sentencing guideline range. Just prior to Petitioner's decision to accept the plea bargain, the prosecutor informed the trial court and Petitioner that if he were convicted after trial that the sentencing guidelines would call for a minimum term of 22.5-to-56.25 years. This range was not pulled from thin-air. An examination of the applicable sentencing guidelines shows that the prosecutor calculated them to place Petitioner in the highest possible bracket, "VI-F," which calls

for a recommended minimum sentence between 270 and 450 months. *See* MICH. COMP. LAWS 777.62. And because Petitioner was charged with being a third-time habitual felony offender, the guideline range was subject to a 50% increase that raised the range to between 405 and 675 months, or to 22.5-to-56.25 years. *See* MICH. COMP. LAWS 777.21(3)(b). Prior to sentencing, the probation department lowered the Prior Record Variable score one level and placed Petitioner in the "VI-E" bracket. With a 50% increase, this scoring called for a minimum sentence range between approximately 21 and 35.5 years. After hearing argument at the sentencing hearing itself, the trial court placed Petitioner in a still lower bracket that called for a minimum sentence between close to 17 years and a little over 28 years.

The fact that the final guideline range changed from what the prosecutor said he would seek following a trial to the time a final determination was made at the sentencing hearing did not affect the voluntariness of Petitioner's plea. An incorrect estimate of the ultimate sentence by the parties does not serve as a basis to conclude that the plea was not knowingly and intelligently made. *United States v. Stephens*, 906 F.2d 251, 253-54 (6th Cir. 1990). It was revealed at the sentencing hearing by Petitioner that he had met with his attorney on February 26, 2006, prior to the plea, and that the sentencing guidelines were discussed. Petitioner stated that his attorney told him that the guideline scoring made by the prosecutor was not accurate and that the prosecutor had erroneously given him Prior Record Variable points for an assaultive history. ST, at 6-7. This correction was apparently made by the probation department, and accounts for its lower-scoring prior to sentencing. Petitioner therefore knew at the time he entered the plea that the prosecutor's scoring of the guidelines was disputed by his attorney, and that while there was no certainty he would receive a sentence within the guidelines range of 22.5-to-56.25 years, the prosecutor would be seeking a term within that

range. The fact that Petitioner's attorney ultimately won part of the guideline battle at sentencing does not mean that Petitioner's decision to accept the plea agreement was unknowing or involuntary. It simply means that he traded the uncertainty of a trial and the uncertainty of a sentencing proceeding where the guidelines scoring would be disputed for the certainty of a sentencing agreement.

Petitioner also asserts that the prosecutor overcharged him with being a third-time habitual offender even though he had information that Petitioner's brother had committed the prior offenses. Petitioner has attached to his petition documents that purport to be discharge papers from the Marine Corps to corroborate his claim that he could not have committed the prior offenses because he was overseas. But the allegation that Petitioner's brother committed the prior offenses was known by the prosecutor and disputed prior to the plea. Petitioner raised this allegation - along with the related allegation that his twin brother was also responsible for the instant offenses - during multiple pretrial court proceedings. The presiding judge at these proceedings requested that the prosecutor investigate the matter. At a proceeding held on January 17, 2006, the prosecutor addressed the allegations and stated that it was true that Petitioner had a twin brother but that "they don't look anything alike" and that there was no chance a witness would mistake Petitioner for his brother in a line-up. Later, after Petitioner requested to withdraw his plea, the prosecutor stated that he had contacted Lansing and Washington, and that he believed that Petitioner's military service consisted of one week in boot camp before he dropped-out. Again, the factual dispute over whether Petitioner was overseas when the prior offenses were committed did not render Petitioner's plea unknowing or involuntary. It only shows that Petitioner traded the uncertainty of whether he would be found to be a habitual offender after a hearing for the certainty of a sentencing agreement.

The state courts did not unreasonably deny Petitioner relief with respect to this claim. In exchange for his plea and his agreement to receive a minimum sentence of fifteen years, the prosecutor dismissed all the charges in two other cases and agreed to a sentence that was far below his calculation of the guidelines. In other words, the plea and sentence agreement was not illusory because Petitioner received a real, tangible benefit in consideration for the plea. *Daniel v. Overton*, 845 F. Supp. 1170, 1174 (E.D. Mich. 1994). Because Petitioner derived a real benefit from his plea bargain in this case, he is therefore not entitled to habeas relief on this claim. *See McAdoo v. Elo*, 365 F. 3d 487, 498 (6th Cir. 2004).

### B. Trial Court Coercion

Petitioner's second claim asserts that the trial judge injected himself into the plea-bargaining process and created a coercive atmosphere that rendered his plea involuntary. Respondent asserts that the claim is without merit. The Court finds that the state court's unexplained denial of this claim on the merits was not so lacking in justification that there was "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement" as required for habeas relief under the *Harrington* standard.

A trial court may not coerce a criminal defendant's plea by, for example, initiating a plea bargaining conference and indicating that it thought the defendant did not have a defense to the charges. *United States v. Barrett*, 982 F.2d 193 (6th Cir. 1992). But simply informing a defendant about the effect of his decisions is not impermissible participation in the plea negotiation process. *Williams v. United States*, 47 Fed. Appx. 363, 370 (6th Cir. 2002). Similarly, informing the defendant of the positive and negative effects of pleading guilty is not coercive and does not constitute impermissible court participation in the plea negotiation process. *Id.* Rather, such

-14-

comments ensure that the defendant has been made fully aware of the effects of his decision.

In this case, on the date of the plea, the trial judge elicited from the prosecutor the difference in sentencing exposure Petitioner would face if he accepted the plea bargain or if he was convicted after a trial. He also made reference to the fact that Petitioner had a two-year-old son, and that the case would likely be transferred to another judge to conduct the trial. In context, it is clear that the trial judge intended to communicate to Petitioner that the plea bargain was a good deal. But the court never stated its desire to have Petitioner accept the deal. Indeed, the trial judge mentioned that he would not even be the judge who tried the case. During the plea hearing itself, Petitioner acknowledged that he was pleading freely and voluntarily. In fact, after the prosecutor lowered the sentencing agreement by one year, Petitioner did not want to put-off the decision any further and asked that the plea be taken immediately. Accordingly, Petitioner did not accept the plea bargain because he was coerced to do so by any statements by the trial judge. He likely did so to avoid a much lengthier sentence, which was a strong possibility if he had gone to trial. The prosecutor stated at the sentencing hearing that Petitioner had confessed in three of the cases and that the victims in all five cases had identified him at a line-up.

Furthermore, the trial court had ruled that evidence of each crime would be admissible as other-acts evidence in each case. A plea is not compelled and invalid "whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." *Brady*, 397 U.S. at 751. Therefore, Petitioner's second claim lacks merit, and it does not provide a basis for granting habeas relief. More to the point, the state court's rejection of Petitioner's claims on the merits was not so unreasonable that it constituted "an error

well understood and comprehended in existing law beyond any possibility for fairminded disagreement" as required for habeas relief under the *Harrington* standard.

## V. Certificate of Appealability

Before Petitioner may appeal this decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the claims. *Id.* at 336-37. The Court concludes that a certificate of appealability is not warranted in this case because Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims.

## VI. Conclusion

For the foregoing reasons, IT IS ORDERED that the petition for a writ of habeas corpus is DENIED and the matter is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

                                      s/Lawrence P. Zatkoff
                                      LAWRENCE P. ZATKOFF
                                      UNITED STATES DISTRICT JUDGE

Dated:  April 14, 2011

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on April 14, 2011.

                                      s/Marie E. Verlinde
                                      Case Manager
                                      (810) 984-3290